LA5HCusC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   IN RE:
                                        18 MD 2865 (LAK)
4
    CUSTOMS AND TAX ADMINISTRATION
5   OF THE KINGDOM OF DENMARK
    (SKAT) TAX REFUND LITIGATION,
6                                       Conference

7   ------------------------------x
                                        New York, N.Y.
8                                       October 5, 2021
                                        10:40 a.m.
9
    Before:
10
                    HON. LEWIS A. KAPLAN,
11
                                        District Judge
12
                         APPEARANCES
13
    HUGHES HUBBARD & REED LLP
14       Attorneys for Plaintiff SKAT
    BY:  MARC WEINSTEIN
15       CAROLYN HARBUS
         WILLIAM MAGUIRE
16
    KOSTELANETZ & FINK, LLP
17       Attorneys for Defendants Azalea Pension Plan, et al.
    BY:  SHARON McCARTHY
18       NICHOLAS BAHNSEN

19   WILMER CUTLER PICKERING HALE AND DORR LLP
         Attorneys for Defendants Avanix Management LLC, et al.
20   BY:  ALAN SCHOENFELD
         ALLISON STODDART
21
    POULOS LoPICCOLO P.C.
22       Attorneys for Defendants Roger Lehman, et al.
    BY:  JOSEPH LoPICCOLO
23
    WILLIAMS & CONNOLLY LLP
24       Attorneys for Defendants Sander Gerber and Sander Gerber
    Pension Plan
25   BY:  AMY McKINLAY

LA5HCusC

APPEARANCES (Cont'd)

GUSRAE KAPLAN NUSBAUM PLLC
        Attorneys for Defendants Goldstein defendants
BY:  MARTIN H. KAPLAN

K&L Gates LLP
        Attorneys for Defendants DW Construction, et al.
BY:  JOHN C. BLESSINGTON

BINDER & SCHWARTZ LLP
        Attorneys for Defendants ED&F Man Capital Markets Ltd., et al.
BY:  NEIL S. BINDER
        GREG C. PRUDEN

KOSTELANETZ & FINK, LLP
        Attorneys for Defendants John Doscas, et al.
BY:  SHARON McCARTHY

MOORE TAX LAW GROUP LLC
        Attorneys for Defendant Robert Klugman
BY:  ZHANNA ZIERING (Telephonic)

LA5HCusC

1          THE DEPUTY CLERK:  In re Customs and Tax

2     Administration of the Kingdom of Denmark Tax Refund Litigation,

3     counsel for plaintiff SKAT, can you please put your appearances

4     on the record.

5          MR. WEINSTEIN:  Good morning, your Honor.  Marc

6     Weinstein, with Bill Maguire and Carolyn Harbus, for plaintiff.

7          THE COURT:  Good morning.

8          MR. WEINSTEIN:  I say that with an appropriately wide

9     smile under my mask.

10          THE DEPUTY CLERK:  Counsel for defendants Azalea

11     Pension Plan, et al., please state your appearance for the

12     record.

13          MS. McCARTHY:  Sharon McCarthy, your Honor.  I'm here

14     with my colleague Nicholas Bahnsen, in the jury box.  Good

15     morning.

16          THE COURT:  Good morning.

17          THE DEPUTY CLERK:  Counsel for defendants, Avanix

18     Management, LLC.

19          MR. SCHOENFELD:  Good morning, your Honor.  Alan

20     Schoenfeld, from Wilmer Hale, joined by Allison Stoddart.

21          THE COURT:  Good afternoon -- morning.

22          THE DEPUTY CLERK:  Counsel for defendants Roger

23     Lehman, *et al.*

24          MR. LoPICCOLO:  Good morning, your Honor.  Joseph

25     LoPiccolo, Poulos LoPiccolo, P.C.

LA5HCusC

1           THE COURT:  You want to try that again.

2           MR. LoPICCOLO:  Joseph LoPiccolo, Poulos LoPiccolo,

3   P.C., your Honor.

4           THE COURT:  Thank you.

5           THE DEPUTY CLERK:  Judge, next appearance on the

6   appearance seat is the attorney who had to turn around in

7   traffic, for defendants Robert Klugman, et al., Zhanna Ziering

8   is listening on the phone.

9           THE COURT:  OK.

10          THE DEPUTY CLERK:  Defendants Sander Gerber and Sander

11  Gerber Pension Plan.

12          MS. McKINLAY:  Good morning, your Honor.  Amy

13  McKinlay, from Williams & Connolly.

14          THE COURT:  Afternoon -- good morning.  I'll get

15  oriented here.

16          THE DEPUTY CLERK:  Counsel for defendants, Goldstein

17  Law Group.

18          MR. KAPLAN:  Good morning, your Honor.  Martin H.

19  Kaplan, Gusrae Kaplan Nusbaum PLLC, for the Goldstein

20  defendants.

21          THE COURT:  Good morning.

22          THE DEPUTY CLERK:  Defendants John Doscas, et al.

23          MR. SMITH:  Good morning, Eric Smith, Kostelanetz &

24  Fink.

25          THE COURT:  Good morning.

LA5HCusC

```
 1            THE DEPUTY CLERK:  Counsel for defendant Acorn Capital
 2   Corporation Employee Profit Sharing Plan, et al.
 3            I was told they weren't appearing, Judge.
 4            THE COURT:  OK.
 5            THE DEPUTY CLERK:  And defendants Ballast Ventures LLC
 6   Roth 401(k) Plan I was told were not appearing.
 7            THE COURT:  OK.
 8            THE DEPUTY CLERK:  Defendants/third-party plaintiffs
 9   DW Construction Inc. Retirement Plan, et al.
10            MR. BLESSINGTON:  Good morning, your Honor.  John
11   Blessington for, what I've described for shorthand, the Utah
12   defendants and the Pennsylvania defendants.
13            THE COURT:  OK.  Thank you.
14            MR. BLESSINGTON:  Thank you.
15            THE DEPUTY CLERK:  Third-party defendant ED&F Man
16   Capital Markets Ltd.
17            MR. BINDER:  Good morning, your Honor.  Neil Binder,
18   Binder & Schwartz.  I'm joined by Greg Pruden.
19            THE COURT:  Good morning.
20            OK.  I thank you all for the very comprehensive
21   reports.  Here's what I hope to accomplish this morning.  I
22   want to make sure I'm fully current on the discovery because
23   some time has passed since you filed.  I'm going to set a
24   schedule, at least I hope I'm going to set a schedule, which
25   will be it, no more postponements, and then go through the
```

LA5HCusC

1    procedure for trying to move this in the general direction of

2    disposition if not more.

3            So a few questions on the discovery:  I have on my

4    list four open matters relating to documents.  The first is a

5    motion to compel ED&F that was filed a long time ago, and I was

6    told when that was briefed by ED&F that there was an

7    application pending in the High Court in London with respect to

8    ED&F's request for a determination that material sought in

9    discovery here was subject to the UK litigation privilege, and

10   I don't believe I've heard another word about what, if

11   anything, ever happened to that or if it's still pending.

12           So is anybody in a position, I guess it would be

13   Mr. Binder, what's going on with that?

14           MR. BINDER:  Yes, your Honor.  Neil binder for ED&F

15   Man Capital Markets.

16           So there has been some subsequent updates to the Court

17   in letters from counsel for both sides, but to just tell the

18   Court where things stand at the moment, the court in England

19   denied ED&F's claim of privilege, and then that decision, the

20   appellate court in England granted permission for ED&F to

21   appeal.  The standard and what the Court find was that ED&F had

22   a real prospect of success on appeal.

23           THE COURT:  And when is that appeal to be heard?

24           MR. BINDER:  There's more to the history here.

25   Subsequently, the Court in England dismissed SKAT's claims

LA5HCusC

1    against ED&F Man and others.

2              THE COURT:  I'm sorry.  Is that in this litigation

3    over privilege?  No.

4              MR. BINDER:  No, the underlying case --

5              THE COURT:  This is the Dicey principle?

6              MR. BINDER:  Correct.

7              THE COURT:  Right.

8              MR. BINDER:  So there are two grounds for the

9    dismissal -- or SKAT had two claims, which is one is the Dicey

10   rule, which is the revenue rule, and the other SKAT has an

11   argument that under a treaty -- they refer to it as the

12   Brussels regulation -- that even if the Dicey rule applies,

13   they're still entitled to enforce a tax judgment in Denmark.

14   The Court in England dismissed both of those claims against

15   SKAT.

16             THE COURT:  Look, I don't mean to derail you or

17   anything, and I know that this is the center of your defense,

18   but the question I'd like answered is what is the status of the

19   litigation over the litigation privilege in the UK courts?

20             MR. BINDER:  Right.  OK.  So to simplify, your Honor,

21   the status is that it is pending subject to a determination of

22   SKAT's appeal.  So both SKAT and ED&F agreed to essentially not

23   advance the appeal because it would, of course, be moot if SKAT

24   is unsuccessful on appeal.  However, if SKAT is successful on

25   appeal -- and this is a critical issue to be decided under

LA5HCusC

English law in that proceeding -- what we've asked the Court,

and it's in letters, is that the Court simply wait until it's

determined whether SKAT's successful on appeal, and then if it

is, then the English appellate court will determine the

privilege issue.  Yesterday, as it turns out, the Court in

England advised the parties that it is available in January to

hear SKAT's appeal of the merits.

THE COURT:  Of the Dicey decision?

MR. BINDER:  Well --

THE COURT:  Dicey/Brussels?

MR. BINDER:  Right.  Actually, SKAT's not even

appealing the Dicey decision with respect to ED&F.  So the

finding that the revenue rule applies is actually fixed.

That's final.

THE COURT:  I'm sorry.  Say that again, please.  I

know it's very hard with the masks.

MR. BINDER:  I know.

THE COURT:  You should try doing a trial like this.

MR. BINDER:  I can't imagine.

THE COURT:  I don't have to imagine.

MR. BINDER:  It's just hard to breathe.

SKAT has not appealed the Dicey rule decision with

respect to ED&F.  So as far as ED&F goes, there's a final

non-appealable determination that SKAT's claims against ED&F

are barred by the Dicey rule.  SKAT is, however, running the

1    argument on appeal that even though the Dicey rule applies,

2    it's within the Dicey's rule, the Dicey rule doesn't apply by

3    virtue of this treaty.

4         In any event, presumably that argument will be heard

5    in January, and if SKAT were successful, then the privilege

6    issue would have to be addressed.  So we don't think there's

7    any urgency for resolution.

8         THE COURT:  I've rarely met a defendant who did.

9         MR. BINDER:  But in part we're not even defendants

10   here, and that's part of why there's no urgency.  The issue of

11   the documents relates to a series of subset of approximately 80

12   tax vouchers which ED&F has acknowledged incorrectly stated

13   that the pension plans were entitled to a withholding reclaim

14   or, as it's stated, that they suffered withholding tax.

15        ED&F acknowledges that here what these documents

16   involve are counsel's investigation in connection with FCA --

17   or to the FCA, which could give rise to litigation, and those

18   are all English law privilege issues.  The other set are board

19   presentations and minutes by counsel.

20        THE COURT:  I know you want to sum up to the jury, but

21   I haven't got time for it.

22        Thank you.  You've answered my question.

23        MR. BINDER:  Thank you, your Honor.

24        THE COURT:  Well, I have one more question, and I'll

25   hear from both sides on it.

LA5HCusC

1          Assuming, for the sake of argument, that what I'm

2   going to call the Dicey appeal gets listed in the Court of

3   Appeal for January, what are the parties' respective

4   expectations about when there would be a decision?

5          MR. BINDER:  So I do not know the answer to that, your

6   Honor.  I would have to confer with counsel in England to get a

7   sense of the timing for all that.  I don't know.

8          THE COURT:  Mr. Weinstein?

9          MR. WEINSTEIN:  I can't give anything more precise

10  than that, unfortunately.  What I can say is one further update

11  for the Court in this context.  When we last wrote to the

12  Court, we informed you that the High Court in England had only

13  permitted leave to appeal on the second ground, not on the

14  Dicey rule ground of appeal, and that SKAT was applying to the

15  Court of Appeal to be able to appeal on the Dicey rule itself.

16  Last week, the Court of Appeal granted that application, so

17  that will be up on appeal.

18          As far as timing goes, granting that application alone

19  took, I think, four, five, maybe even six months.  So it is

20  very difficult to predict how long it will take them to

21  actually render an opinion once the appeal's heard.

22          THE COURT:  Well, look, I understand that.  But not

23  infrequently the Court of Appeals rules from the bench, but on

24  the other hand -- and I love the charm of the phrase one

25  sometimes sees in appellate and other decisions in England, as

LA5HCusC

1    one does here, but they have a very cute phrase for it, the

2    judges took time for their decision, as I'm sure you all know.

3    OK.  Fine.

4              MR. WEINSTEIN:  Just for your Honor's convenience, as

5    far as updates on this issue that the parties have sent to your

6    Honor over time, on the top of page 2 of the July 29 status

7    report, we cite to the various ECF numbers or dates of letters

8    that provide the updates on the status of that.

9              THE COURT:  I appreciate that.

10             MR. WEINSTEIN:  Yes.

11             THE COURT:  All right.  The second item on my document

12   list is a pending motion on which the ball is in my court to

13   compel SKAT to produce documents that are produced as a

14   parliamentary inquiry.  I'm saying that only to make you all

15   aware that I'm aware that the ball's in my court on that.

16             Now, in the third item, pretrial order 21, on which I

17   ruled May 22, ordered the production of various documents.

18   What happened?  Is it done?

19             MR. WEINSTEIN:  Yes, your Honor, I believe that's

20   done.  I just want to make sure I'm getting to the right order,

21   because I think in our status report we had informed the Court

22   that that had not -- documents had not been produced.  They

23   were produced shortly after that report was filed.

24             THE COURT:  Thank you.  That's why I'm asking.

25             Then I'm aware that there's a motion to compel by SKAT

LA5HCusC

1    which I've referred to Judge Lehrburger.

2           Is there anything else with respect to documents that

3    I haven't mentioned?

4           MR. WEINSTEIN:  I don't believe so, your Honor.  And

5    that last motion that your Honor sent down to the magistrate

6    judge, that was decided as well.

7           THE COURT:  OK.  Great.

8           When was it decided?

9           MR. WEINSTEIN:  It was decided, yes, June.  I can get

10   you the exact date.

11          THE COURT:  Doesn't matter.

12          MR. WEINSTEIN:  Yes.

13          THE COURT:  So there's been no appeal from that

14   ruling, right, whatever it was?

15          MR. WEINSTEIN:  Correct.  There's been productions

16   made as a result.

17          THE COURT:  So I go on to depositions.  To the extent

18   I gleaned it from the documents I reviewed last night and

19   previously, SKAT indicated it wanted 11 depositions as of that

20   date, and I have a couple of questions about that.

21          Did that figure, first of all, include Ben-Jacob and

22   Lehman?

23          MR. WEINSTEIN:  Yes, your Honor.

24          THE COURT:  How many remain to be done of the 11?

25          MR. WEINSTEIN:  Mr. Lehman's deposition was taken, so

LA5HCusC

1    that leaves approximately ten.  Mr. Ben-Jacob's deposition is

2    scheduled for next week, Monday and Tuesday.

3         THE COURT:  Are the other nine the Danish witnesses,

4    or that's something else altogether?

5         MR. WEINSTEIN:  That's something else altogether.  I

6    can give your Honor an update on that as well.

7         THE COURT:  We'll get to that.

8         Who are the other nine?

9         MR. WEINSTEIN:  So there are -- there's a 30(b)(6)

10   witness from ED&F that is scheduled for later this week, your

11   Honor.  There are a few defendants who, for health or other

12   reasons, had not been able to be deposed.  We're still checking

13   if that's the case.

14        I just can give you names.  Gavin Cresczenzo had been

15   stationed in Afghanistan for a long time.  So we have inquired

16   to see if he is back and available for deposition.

17        Kevin Kenning has had health issues.

18        THE COURT:  Kenning?

19        MR. WEINSTEIN:  K-e-n-n-i-n-g.  So we've agreed to

20   just put that off until he's physically able to be deposed.

21        There are two other defendants, Mr. Gerber and

22   Mr. Burns, where there's been discussion with counsel as to

23   whether we would need to take their deposition, because we

24   believe we can actually resolve those cases.

25        As far as named defendant depositions go, that is it

1    for those who have not been deposed at all.  There are one or

2    two that we believe we will need to continue their deposition,

3    one by agreement and one not yet.

4           THE COURT:  So the end is in sight with respect to

5    your depositions, is that right?

6           MR. WEINSTEIN:  Yes.  There are also some nonparty

7    depositions that we've noticed for the end of October.  So we

8    are attempting to complete all depositions by the end of

9    October.

10           THE COURT:  Now, at one point I was told the

11    defendants, which I take to be the defendants generally, wanted

12    to take ten depositions, and then there was some separate issue

13    relating to Goldstein with respect to ED&F.  Can somebody bring

14    me up to date on that?

15           Thank you, Mr. Weinstein.

16           MR. WEINSTEIN:  Sure.  Your Honor, with respect to the

17    defendants' requested depositions, so over the past two weeks,

18    prior to this week, six of those depositions were taken in

19    Denmark.

20           THE COURT:  That's six out of the nine?

21           MR. WEINSTEIN:  Right.  We had the remaining three set

22    for next week.  The defendants informed us yesterday they were

23    withdrawing two of those.  So there is one left to go that is

24    scheduled for next Friday.  So, as far as I know, that does it

25    for defendants' depositions of SKAT witnesses.

LA5HCusC

1            I will turn it over to Mr. Goldstein's counsel with

2    respect to their notices.

3            THE COURT:  Before we get to Mr. Gold- --

4            MR. WEINSTEIN:  Kaplan.

5            THE COURT:  Forgive me for not being able to remember

6    all the names at first.  Mr. Kaplan.  I ought to be able to

7    remember that, right?  Can't have too many good Kaplans.

8            Putting aside, Mr. Kaplan's clients, that takes care

9    of all the defendants' depositions, is that right?

10           Ms. McCarthy, do you speak for the multitude?

11           MS. McCARTHY:  I'll speak, your Honor.  Yes, it does

12   take care of defendants' depositions.

13           Your Honor, I just have one point to make here.

14   Mr. Weinstein just mentioned that SKAT has issued subpoenas for

15   nonparties, and those depositions are scheduled to take place,

16   according to their notices, before the end of October.

17           Your Honor, we agreed with SKAT on a June 30 discovery

18   cutoff.  So we just received notice on Friday of three of those

19   four depositions.  We do not believe that that's appropriate

20   for SKAT to be continuing to issue notices of subpoena past

21   June 30.  We agreed with SKAT that they could go past June 30

22   for depositions of defendants, and they agreed that we could

23   continue with our depositions in Denmark that we were

24   authorized to take.  Beyond that, we believe discovery closed,

25   according to our agreement, on June 30.  We ask the Court to

1      enforce that.

2              THE COURT:  Who are the nonparties, Mr. Weinstein, and

3      why now?

4              MR. WEINSTEIN:  Yes, so the four nonparties, your

5      Honor, are all attorneys at Arnold & Porter, which is

6      Mr. Ben-Jacob's law firm.

7              A number of reasons for why now.  We still, to date,

8      have not been able to take Mr. Ben-Jacob's deposition.  In his

9      recent answer to the most recent complaint against him, he

10     alluded in an introductory statement to the fact that he was

11     relying on work that others in his firm or advice that others

12     in his firm provided to the defendants.  So we need to know

13     what they're going to say, and we still don't know what he's

14     going to say about that other than that.

15             In addition, as a result --

16             THE COURT:  And earlier there was a whole privilege

17     assertion as to all of the Arnold & Porter stuff.

18             MR. WEINSTEIN:  Correct.  And as your Honor noted that

19     one of the issues there was your Honor assigned down to the

20     magistrate judge, and that decision went in our favor.  So

21     there was an additional large, voluminous production of

22     documents over the summer --

23             THE COURT:  Yes.

24             MR. WEINSTEIN:  -- with internal communications at

25     that firm.

LA5HCusC

1          THE COURT:  OK.  Ms. McCarthy, I understand your

2    irritation, but I think the explanation is perfectly

3    reasonable.  Although I will, as to depositions, enforce your

4    agreement, as respects nonparties, I will not do so with

5    respect to these four depositions.  I think there are

6    extenuating circumstances.

7          MS. McCARTHY:  Your Honor, just one point.  I just

8    want to point out, though, we gave all the billing records in

9    March of this year to SKAT.  They knew who all the people were.

10   They could have noticed depositions.  There's really no basis

11   for this delay.

12         But I understand where the Court is -- where you are

13   on this.  Can we ask, though, that the Court require that

14   everything be done by October 31, then, as far as these

15   nonparties?

16         THE COURT:  Well, look, in principle, sure, but one

17   learns in time that somebody gets hit by a car, somebody gets

18   COVID, there are sometimes extenuating circumstances.  So,

19   obviously, they ought to be done by the end of October, but if

20   there's some good reason why something can't be done by the end

21   of October, I'll listen to it.

22         MS. McCARTHY:  Thank you, your Honor.

23         THE COURT:  That takes care, then, of depositions.

24         I understand the debate about the request for

25   admissions and interrogatories.  My experience is nobody ever

1    won or lost the case that I was close to on either, and we're

2    going to take care of that with an overall fact discovery

3    cutoff, and that's where we are.  OK.

4           MS. McCARTHY:  Your Honor, I'm so sorry.  I left one

5    thing out.

6           THE COURT:  Yes.

7           MS. McCARTHY:  We had been waiting for SKAT to tell us

8    who will be verifying their interrogatories.  We still today do

9    not know who that person is, and we've completed, for the most

10   part, our depositions of SKAT personnel.  So we may, depending

11   upon who they put forward as the verifier, need to question

12   that witness.  So that's one caveat, one carve-out that we

13   would ask for.

14          THE COURT:  That's a fair carve-out.

15          MS. McCARTHY:  Thank you, your Honor.

16          THE COURT:  I looked at your proposed schedule, and

17   here's what we're going to do:

18          All fact discovery is to be completed by December the

19   4th, and that includes requests for admissions and

20   interrogatories.

21          Also to be done by that date is that all parties are

22   to identify their experts and the topics on which they will

23   testify.  This is not the full Rule 26 disclosure that I'm

24   talking about.  It's just what I said, who are they and the

25   topics.

LA5HCusC

1          Also to serve all Rule 44.1 notices.  I would imagine

2     if a notice is not served or incomplete, the other side, as to

3     whatever points have not been covered, will take the position

4     that the law of the forum governs or, I guess in respect of

5     cases that were transferred in here, the transferor forum.  And

6     without deciding the question, that probably would have some

7     merit.  So you want to be complete.

8          Initial expert reports and the other disclosures

9     required by Rule 26 will be due by New Year's Eve; rebuttal

10    expert reports, by February 1; reply expert reports, by

11    February 28; and all expert discovery, including depositions,

12    by April 8.

13          Does that strike anybody as unduly difficult?

14          Hearing no objection, that will be the schedule.

15          Now, here's what seemed to me to make sense with

16    respect to summary judgment.  And I appreciate your input on

17    it, and I offer this up initially for comment, and then we'll

18    see where we go.  It seems to me to make sense to go with

19    bellwether cases for summary judgment purposes.  I liked the

20    plaintiff's suggestion that we do, from the Solo group of

21    cases, one case from 2012-13 and four cases from 2014-15, on

22    the theory that the plaintiffs articulated.  In addition, we do

23    one Annex E case, as that's referred to in the letters, with

24    respect to ED&F.  And if I get a considered suggestion for a

25    second ED&F case relatively soon, I'll consider it, without

having prejudged the question.

I hope that the parties can come to agreement on the specific cases to be in the bellwether category, and I thought it would make sense also to seek agreement for each slot in the bellwether category. So right now we're talking about six cases, the ED&F Annex E case and the five Solo cases; for each slot, two backups, in case the, hopefully, agreed case in that slot gets settled or otherwise goes away so that we will not have a delay in the schedule in case we lose one of the bellwethers. If you can't agree, I'll have you submit, each side, nominations for any of these cases, the five bellwethers or the ten backup cases, and the backup cases should be identified as to particular slots. We'll get to the timing in a minute.

Then I thought it would make sense to have the plaintiff and the defendant, or defendants, in each bellwether case -- and I think this probably applies to backup cases, too, but each bellwether case for sure -- who intends to move for summary judgment or partial summary judgment to serve a draft outline of the proposed motion, just an outline, and a draft Rule 56.1 statement on the nonmoving parties.

I would then propose a month to see if you can thrash out an agreed 56.1 statement. That worked very well in the *Parmalat* case. They actually managed pretty much to accomplish it. And to whatever extent either a moving or a nonmoving

LA5HCusC

party thinks there are material facts as to which there's no
genuine dispute, but they can't get agreement on that, there
would be a supplemental 56.1, to which there would be a
response in the ordinary course.

Once we get through with the exercise on the 56.1
statements and know where we stand on what's agreed and what
isn't, we would then have a schedule for -- I think it would
make sense for the plaintiff to move first, but I'll consider
that either way.  There's an argument the other way, too.  Then
we'd have oppositions to the initial summary judgment and any
cross-motions together; reply papers in support of the initial
motion and opposition to cross-motions; and, finally, reply
papers in support of the cross-motions.

That's the general framework, and then we can go back
and talk about the timing.  So I'd be happy to hear any
suggestions, thoughts about the framework.

Sir.

MR. SCHOENFELD:  Hi, your Honor.  Alan Schoenfeld.  I
take it that your Honor has sort of rejected the proposal of
segregating --

THE COURT:  Absolutely.  Look, just so you're clear,
it is entirely possible that the answer to the revenue rule
question is fact dependent.  You took your best shot at the
beginning of the case for the proposition that it isn't and
you're entitled to dismissal, and fundamentally, I said I want

LA5HCusC

1    to see the facts.  And nothing's changed in my mind about that.

2    I read the UK decision.  I have great respect for the UK

3    courts.  But they do UK law, and I do American law.  And we

4    each have a function to perform.

5              MR. SCHOENFELD:  Understood.  May I ask one question

6    in that respect?

7              THE COURT:  Sure.

8              MR. SCHOENFELD:  We have a collateral estoppel

9    argument on the revenue rule based on the UK proceedings.  I

10   understand why it might not be prudent to make that now, given

11   the pendency of the appeal, but let's assume for a moment that

12   the UK High Court rules on January 22, or whenever it is.  Does

13   it make sense, in your Honor's view, for us to move then just

14   on the question of collateral estoppel, which might obviate the

15   need for further expert work or summary judgment proceedings?

16             THE COURT:  I can't get that far down the road.  I

17   don't know what's going to happen there.  And the law of

18   collateral estoppel in this context is not fully clear in my

19   mind at the moment.  If we were talking about the Supreme Court

20   of Arkansas and the full faith and credit clause, that would be

21   one thing.  Whether and how it might apply here would be

22   another thing, could be another thing, and I don't have a view

23   on that right now.

24             My view here is that we put the whole case forward, to

25   the extent it can be put forward, for each bellwether on the

LA5HCusC

 1  basis that this is a standalone summary judgment exercise in a

 2  conventional civil case.  You put in whatever issues you think

 3  warrant decision on summary judgment and all the reasons why

 4  summary judgment shouldn't be granted if you're the nonmoving

 5  party, and we'll see what happens.  I don't intend to make this

 6  an iterative process.

 7          MR. SCHOENFELD:  Understood.  I assume your Honor

 8  would like an update when we do understand either the timing or

 9  the decision of the High Court?

10          THE COURT:  Yes, of course.  Absolutely.  Absolutely.

11  Fine.

12          Any other thoughts about the framework?

13          MR. WEINSTEIN:  Yes, your Honor, two.  We're fine with

14  the framework generally.  There was a third category of

15  custodian, NCB, just want to --

16          THE COURT:  I deliberately left it out because there

17  are -- the group of cases is very small.

18          MR. WEINSTEIN:  Yes.

19          THE COURT:  If we do the Solo group, which is going to

20  take most of the effort here, and we do the one or,

21  conceivably, two ED&F cases, it's going to change the --

22  whichever way I decide, it's going to change the complexion of

23  this whole thing, in my judgment.  And that may, as a practical

24  matter, be the end of this litigation.  By settlement, by

25  dismissal, by judgment for the plaintiff, I don't know, but it

LA5HCusC

1    will change it.  It will be different.  And those odds and ends

2    won't matter.

3         MR. WEINSTEIN:  I assumed your Honor was on top of

4    that, and you've now confirmed it.  Just wanted to make sure

5    that that wasn't getting lost.

6         Then, secondly -- well, two things:  One is I would

7    just propose to add sort of a date in here, your Honor.  I

8    think it would be helpful to the parties.  We'll be exchanging

9    draft 56.1 statements at some point that your Honor sets, with

10   a month to hash it out.  If your Honor would, I would also add

11   a date within that month period, like two weeks each party

12   needs to actually give their initial responses to that draft so

13   that we have a set date by which you need to respond to the

14   other party, just because there's a lot of parties, and I think

15   it's helpful to have a date.

16        THE COURT:  That seems to make sense.

17        Anybody disagree with that?  OK.

18        MR. WEINSTEIN:  Last, we had done a few updates on

19   things that have changed since the last status reports, your

20   Honor, and just because the revenue rule discussion reminded

21   me, also last week your Honor had issued letters rogatory to

22   Switzerland for documents.  That request was initially denied

23   by the lower court there.  That went up on appeal, and also

24   this past week, the Court of Appeal in Switzerland overruled

25   that decision and handled, I would say, the revenue rule, as

LA5HCusC

1    your Honor did in your opinion.

2            THE COURT:  I'm sorry.  Could you say that again more

3    slowly.

4            MR. WEINSTEIN:  Sure.  The Court of Appeal in

5    Switzerland ruled that the allegations here are that the

6    defendants were never taxpayers, there was no taxpayer

7    relationship, and as a result, the revenue rule does not apply.

8    So in complete odds, obviously, with the English High Court.

9            THE COURT:  Inasmuch as I have a copy of the English

10   High Court decision, can I get a translation of the Swiss

11   decision?

12           MR. WEINSTEIN:  Yes, your Honor, we'll submit that to

13   the Court.

14           THE COURT:  OK.  Thank you.

15           Ms. McCarthy.

16           MS. McCARTHY:  I just want to make sure that when he

17   does so, that Mr. Weinstein will provide us with a copy as

18   well.

19           THE COURT:  Oh, of course.

20           MR. WEINSTEIN:  Certainly will.

21           THE COURT:  Then here's the timetable I had in mind,

22   and, once again, if it's unreasonably difficult, I'm sure

23   you'll tell me.

24           Agreement on the bellwether cases or to the extent

25   that you can't agree what they are, your submissions about

LA5HCusC

```
1   which ones I should pick, January 31.
2               Summary judgment outlines and draft 56.1 statements,
3   February 28.  Responses to be served within two weeks
4   thereafter.
5               Filing of a definitive joint 56.1 statement, hopefully
6   complete, but if not complete, to the extent it is possible,
7   and any separate supplementary 56.1 statements, to the extent
8   they're necessary for the intended motions, would be due
9   March 31.
10              Now, let's take it that far.  Is that adequate?  Too
11  generous?
12              MR. SCHOENFELD:  It is, your Honor.  Alan Schoenfeld.
13              THE COURT:  Which?
14              MR. SCHOENFELD:  I think it's fine.  Just one
15  question.  Given the overlap between expert discovery and these
16  deadlines, I assume that outline served on February 28, there's
17  no, like, waiver principle that applies, and if a different
18  argument materializes in expert discovery, which closes
19  April 8, we can still raise it in the summary judgment papers?
20              THE COURT:  Yes.  And then no doubt, as has happened
21  almost every piece of this case, you'll disagree as to whether
22  it was raised previously, and I'll sort it out.
23              Anybody else on that?
24              All right.  Now, I thought motion and cross-motions
25  might be the easiest way of doing this, but maybe that's
```

LA5HCusC

1    mistaken.  And also, who should go first?  Anybody have any

2    different view here?

3        MR. WEINSTEIN:  Your Honor, plaintiff thinks

4    plaintiffs should go first.

5        THE COURT:  OK.  Anybody have a different view?

6        MR. SCHOENFELD:  I think I'd like to consult with the

7    other defendants.  I realize that that makes this difficult,

8    but I think we'd like to move at the same time rather than

9    cross moving.  As I understand it, plaintiffs are just

10   moving -- or SKAT's just moving on falsity and then the two

11   sort of equitable claims.  We have a number of other issues

12   that we would be moving on, and I think it makes sense to move

13   at the same time rather than just oppose and file a

14   cross-motion.

15       THE COURT:  Any reason why not, Mr. Weinstein?

16       MR. WEINSTEIN:  No.  That's fine with us, your Honor.

17       THE COURT:  OK.  We'll do it that way.

18       So that'll be, then, the motions will be due April 15;

19   opposing papers, May 16; reply papers, June 6.

20       MR. WEINSTEIN:  So on that schedule, your Honor, I do

21   think, given at least the description of the various motions

22   that the defendants say they're going to raise, I don't know if

23   they will ultimately, but the 30 days may be a little

24   difficult.  They've got --

25       THE COURT:  Which is the date you're focused on?

LA5HCusC

|   |   |
|---|---|
| 1 | MR. WEINSTEIN:  So I think you had May 16 as |
| 2 | opposition to all motions. |
| 3 | THE COURT:  Yes.  You think that should be a larger |
| 4 | period? |
| 5 | MR. WEINSTEIN:  Slightly larger period. |
| 6 | THE COURT:  All right.  May 23.  And reply papers, |
| 7 | June 13.  Anybody have a problem with that? |
| 8 | OK.  That takes care of summary judgment. |
| 9 | MR. SCHOENFELD:  Your Honor, may I? |
| 10 | THE COURT:  Yes, sure. |
| 11 | MR. SCHOENFELD:  The parties have worked together |
| 12 | relatively well on all proposals.  Can we propose page limits |
| 13 | and that kind of thing to your Honor a month in advance of the |
| 14 | deadline? |
| 15 | THE COURT:  Sure.  But, look, just so that we're |
| 16 | clear, I'm anticipating that, in the absence of some |
| 17 | alternative ruling, which I would, of course, consider if there |
| 18 | were a reason for it, I'm expecting one set of papers on each |
| 19 | side.  Now, I understand there's some variation in position, |
| 20 | perhaps, between ED&F and the defendants, and so there isn't |
| 21 | complete overlap there, to say the least.  But to the extent |
| 22 | there is overlap, I would like one brief, and then if ED&F |
| 23 | needs to supplement or the other defendants need to supplement, |
| 24 | we'll do it that way.  But I don't want to read 25 or even four |
| 25 | repetitious sets of papers on the defense side. |

LA5HCusC

1          MR. BINDER:  Your Honor, Neil Binder.

2          THE COURT:  Yes.

3          MR. BINDER:  Just to be clear, as we understand the

4    proposal, the ED&F motions refer to motions by the defendants

5    who used ED&F's custodial services, and that the bellwether

6    cases will be chosen with SKAT and the defendants, because ED&F

7    is a third-party defendant here.  I think that's what everyone

8    has in mind, and I just wanted to make sure there was no --

9          THE COURT:  Would it be your contemplation that ED&F

10   at some subsequent date would seek summary judgment on the

11   third-party complaints?

12         MR. BINDER:  With respect to the third-party

13   complaints, the third-party plaintiffs and the third-party

14   defendants have agreed that now is not the time for that, and

15   so everyone's agreed that that should get put off, and no one's

16   raised an issue with that.

17             What I understand the Court's schedule to refer to are

18   the motion for summary judgment against SKAT's main claim

19   against -- the first-party claim.  SKAT doesn't have a claim

20   against ED&F.  So it's the claim that the defendants have

21   against -- that SKAT has against the defendants, and we expect

22   those defendants who used ED&F's custodial services to be the

23   subject of the bellwether summary judgment.  I think that's

24   what the parties understand.

25         THE COURT:  Unless I tell you otherwise, subsequent to

LA5HCusC

| 1 | this morning, because I want to think about it a little more,
| 2 | we'll go on that assumption.
| 3 |     MR. BINDER:  Thank you, your Honor.
| 4 |     THE COURT:  Anything else, sir?
| 5 |     MR. BLESSINGTON:  Your Honor, if I may, again, John
| 6 | Blessington.
| 7 |     Just with respect to the ED&F, I know you said that
| 8 | you're going to allow for one bellwether case, Annex E, I can
| 9 | see a scenario, depending how this discovery goes that needs to
| 10 | be completed, where we would want to move -- third-party
| 11 | defendants would want to move for summary judgment against SKAT
| 12 | on a non-Annex E.
| 13 |     THE COURT:  On a what?
| 14 |     MR. BLESSINGTON:  On a non-Annex E claim.
| 15 |     THE COURT:  There's a word that starts with the
| 16 | syllable "non," but I don't know what it is.
| 17 |     MR. BLESSINGTON:  Sure.  I'm sorry, your Honor.  So
| 18 | you referred to Annex E.
| 19 |     THE COURT:  Yes.
| 20 |     MR. BLESSINGTON:  There are non-Annex E.
| 21 |     THE COURT:  Oh, non-Annex E.  Yes.
| 22 |     MR. BLESSINGTON:  I don't think that got addressed.  I
| 23 | now you said right now you envision one but possibly a second.
| 24 | I assumed the second would be a non-Annex E.
| 25 |     THE COURT:  That was my assumption.

LA5HCusC

1           MR. BLESSINGTON:  That's fine.

2           OK.  I'll leave it at that, and we'll work it out.  My

3    point being that I could see a situation where we would want to

4    move for summary judgment on a non-Annex E, even though it

5    might not have been identified as a bellwether case, but we

6    would then propose it be identified as a bellwether case.

7           THE COURT:  But if it's not, it should go into the

8    question of what the bellwether cases are.

9           MR. BLESSINGTON:  OK.  The only reason I raise it,

10   your Honor, is because there are 80 reclaims on the Annex E,

11   and then the vast majority, over 300, are not.

12          THE COURT:  Yes.

13          MR. BLESSINGTON:  And they account for in excess of

14   about 50 percent of our reclaim amount.  So that's very

15   important to us.  And right now, based on the record before

16   this Court, and even SKAT acknowledges that they have some

17   discovery, but they don't have the same type of evidence they

18   have with respect to Solo as it relates to what we'll call the

19   ED&F platform defendants.

20          So thank you.

21          THE COURT:  All right.  I will ask -- oh, sir.

22          MR. LoPICCOLO:  Joseph LoPiccolo, Poulos LoPiccolo

23   P.C., on behalf of the Roger Lehman, *et al.*, defendants.

24          Judge, I represent numerous individuals who simply

25   don't have the financial resources to litigate this case, and

LA5HCusC

1    for that reason, it was last year that they submit -- last

2    year, November or December, that they submitted formal offers

3    to settle to SKAT.  I came onto this case in May, and it wasn't

4    until July, about seven months later, that we received a

5    response from SKAT to those offers.

6           So, you know, despite's SKAT's representation that

7    they're willing to settle cases, it's taken quite a bit of time

8    to even get a response.  So here we are talking about summary

9    judgments and experts, and so it's a very expensive part of the

10   case.  I think it's as good a time as any to engage in good

11   faith negotiations, so I'm requesting the Court's assistance in

12   helping to facilitate that.  What I mean is with either

13   court-ordered mediation for those who want to participate or

14   requesting the assistance of a magistrate to help with

15   facilitating a settlement.  It's a very complicated case, and I

16   understand there's a lot of moving parts, but I still have

17   clients that just can't afford this anymore.

18           THE COURT:  Well, I understand your problem.

19           Mr. Weinstein, what about it?

20           MR. WEINSTEIN:  Your Honor, first, we have been

21   involved in many good faith negotiations for settlement of the

22   277 U.S. pension plans that originally put in applications to

23   SKAT for reclaims that we contend are fraudulent.  We've

24   settled with 80.  So it's not as though --

25           THE COURT:  You settled with?

LA5HCusC

1              MR. WEINSTEIN:  We've already settled with 80, so it's

2      not as though we can't reach settlements with people.

3              Mr. LoPiccolo's clients, I understand they've made a

4      number of settlement offers.  I'm not going to get into the

5      types of provisions we're seeking in certain settlement

6      agreements when someone says that they don't have enough money

7      to pay, but we have provided him in a related case, it's a

8      state court case, now with the framework for what we believe

9      would be the type of settlement agreement that would apply to

10     his other clients that are in federal court.  It took a while

11     to get to the type of provisions we think we need.  We're

12     hoping that gets worked out actually quite quickly, and once

13     that does, we think we can apply that framework to others.  But

14     we are ready and willing and have been negotiating in good

15     faith with many, many parties.

16             THE COURT:  What about a mediator or a magistrate

17     judge?

18             MR. WEINSTEIN:  Your Honor, because we have been able

19     to conclude many settlement agreements, I don't think it's

20     necessary.  We now have a framework, I think, to handle certain

21     types of defendants.  They're not going to have any more money

22     in the mediation than they are outside the mediation.  As long

23     as we get transparency on that issue, I just don't think it's

24     going to help advance the ball.  We will do our best to make

25     these move quicker than they have.

1          MR. LoPICCOLO:  With all due respect, your Honor, it's

2     just the time.  And the longer it takes just to get a response

3     or even a draft agreement, that's more and more hearings, and

4     the litigations are continuing, and it's more money my clients

5     have to spend.

6          I have a client in Florida, Florida state court.

7     She's in poverty.  She's practically on food stamps.  And it

8     took SKAT to literally the brink of trial to get an agreement

9     to us, despite the fact that they agreed that this case should

10    be settled for those financial reasons last year.  And all I'm

11    asking -- I don't know what the downside is in having a

12    magistrate help out here, to sort of set control dates and to

13    get involved and maybe get creative in some sort of settlement

14    for those clients that don't have the money.  I don't

15    understand what the hesitance is or, like I said, what the

16    downside is in having --

17         THE COURT:  What I was hearing was two things:  First

18    of all, that it took a long time to get the framework of what

19    the plaintiff thinks the structure needs to be for clients who

20    can't afford to pay perhaps 100 cents on the dollar or 50 cents

21    on the dollar, or whatever it is, but that that exists now.

22         Did I understand that correctly?

23         MR. WEINSTEIN:  You did, your Honor.

24         THE COURT:  All right.  Secondly, the key word I

25    thought I heard was "transparency."  If somebody is coming to

LA5HCusC

1    the plaintiff and saying, I can't afford to pay more than X, it

2    would, I suppose, be a logical response to say, well, show me

3    what your financial situation is.  And I could imagine that

4    becoming an obstacle, and it's an obstacle on which the ball

5    may lie with the defendants.

6          Look, I will not exclude getting somebody involved.

7    From what I understand, although my information may not be

8    totally current, the magistrates are pretty backed up.  I just

9    finished a nonjury trial and strongly urged the parties to

10   settle, for the good of all of them, and got a magistrate judge

11   who had been involved in the case earlier, and she couldn't

12   even talk to them until sometime in November.

13         Now, I don't exclude sending you to Judge Lehrburger,

14   and he's always very helpful and he's very able.  There's also

15   the option of the mediation program, and you could agree on a

16   mediator, mediation program or not.  I will happily urge that.

17   But what I would say is give it, what, another two weeks,

18   Mr. Weinstein, for you to come back to them and talk turkey

19   about what you need in terms of structure and what you need to

20   be satisfied as to the economics.  Can you do that within two

21   weeks for Mr. LoPiccolo?

22         And if that doesn't lead to serious discussions,

23   Mr. LoPiccolo, just drop me a letter, copies to everybody, of

24   course, and I'll do what I can do to get you whatever the Court

25   can provide in terms of mediation.

LA5HCusC

1              MR. LoPICCOLO:  OK.  Thank you, your Honor.

2    Appreciate that.

3              THE COURT:  All right.  Anything else?

4              Ms. McCarthy.

5              MS. McCARTHY:  Just on that same point, I am aware

6    that there are other defendants not represented by

7    Mr. LoPiccolo who have tried to have discussions with SKAT

8    about settlement, and their position has been extreme in what

9    it is that they're requiring from anyone who's looking to

10   settle.  So --

11             THE COURT:  Are we talking extreme economically or

12   extreme --

13             MS. McCARTHY:  Yes.

14             THE COURT:  -- in other ways?

15             MS. McCARTHY:  Extreme economically, your Honor.

16             So I would ask that -- I think that -- I haven't had a

17   chance to discuss this with other defense counsel.  There may

18   be other defense counsel who will also be seeking some sort of

19   assistance in settlement as well.

20             THE COURT:  OK.  That's fine.  Bring it on.  Do what

21   we can do.

22             I'm going to ask that Mr. Weinstein and Ms. McCarthy

23   try to put together a form of a pretrial order embodying what

24   we've said here today in substance.  If it can come with the

25   approval of everybody in the case, that would be great, but I

LA5HCusC

```
 1   view this as a means of getting a little assistance from

 2   counsel, and I'm not going to insist on a stipulation signed on

 3   behalf of everybody in the case because I think that might

 4   be -- it might take a month, and that doesn't make sense.

 5            So the way we'll do it is please submit it, give it

 6   whatever circulation you think is appropriate, but let's get it

 7   done soon.  And then if somebody has a problem with something

 8   that I sign off on, make a motion to reconsider; and if it's a

 9   valid point, I'll deal with it that way.

10            Any problems with that?

11            MS. McCARTHY:  That's fine, your Honor.  Thank you.

12            THE COURT:  Good.  Thank you.

13            I think this was very constructive.  I had no doubt it

14   would be given the counsel involved in this case.  So thank

15   you.

16            (Adjourned)

17

18

19

20

21

22

23

24

25
```